**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3277
_____

UNITED STATES OF AMERICA

v.

MARK CIAVARELLA, JR.,
                                        Appellant.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:09-CR-00272-002)
District Judge: Honorable Edwin M. Kosik
_____

Argued
November 14, 2012

Before: RENDELL, FUENTES, and CHAGARES,
*Circuit Judges*

(Opinion Filed:  May 24, 2013 )

Albert J. Flora, Jr., Esq. **[ARGUED]**
33 West South Street

Wilkes-Barre, PA 18701

William Ruzzo, Esq.
590 Rutter Avenue
Kingston, PA 18704

      *Counsels for Appellant Mark Ciavarella, Jr.*

Peter J. Smith, Esq., United States Attorney
Gordon A.D. Zubrod, Esq., Assistant United States Attorney
**[ARGUED]**
Michael A. Consiglio, Esq., Assistant United States Attorney
Office of United States Attorney
Ronald Reagan Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108

William S. Houser, Esq., Assistant United States Attorney
Amy C. Phillips, Esq., Assistant United States Attorney
Office of United States Attorney
235 North Washington Avenue
P.O. Box 309, Suite 311
Scranton, PA 18503

      *Counsels for Appellee United States of America*
_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Mark Ciavarella, a former state judge, was convicted by a jury in the Middle District of Pennsylvania of racketeering, honest services mail fraud, money laundering conspiracy, filing false tax returns, and several other related crimes. The charges resulted from the so-called "Kids for Cash" scandal that erupted in Luzerne County, Pennsylvania in late 2008. Ciavarella and his fellow judge, Michael Conahan, were accused of receiving over $2.8 million in three years from a commercial builder, Robert Mericle, and an attorney and businessman, Robert Powell, in exchange for helping to construct and operate juvenile detention centers and placing juvenile offenders there. Ciavarella complains that the District Court Judge overseeing his case was biased and should have recused himself early on, when Ciavarella asked him to do so. Ciavarella also assigns numerous trial and sentencing errors, which we discuss in detail below.[1]

Over the course of several years, Ciavarella committed hundreds of juveniles to detention centers co-owned by Powell, including many who were not represented by counsel, without informing the juveniles or their families of his conflict of interest. By the summer of 2008, Ciavarella and Conahan, aware that they were under criminal investigation, met with Mericle and Powell to collaborate on their stories, discuss how to mitigate the effects of damaging witnesses, and encourage the destruction of records. Unbeknownst to them, Powell was wearing a recording device during these

---

[1] Ciavarella raises challenges to evidentiary rulings, sufficiency of the evidence, and the timeliness of his prosecution, as well as claims that his sentence violated his Sixth Amendment right to a jury trial and was substantively unreasonable.

meetings, exposing Ciavarella and Conahan's efforts to obstruct justice.

By early 2009, law enforcement officials gathered sufficient evidence to charge the two judges. Ciavarella and Conahan subsequently entered into an agreement with the Government under which they pled guilty to an Information charging them with wire fraud and conspiracy in exchange for an agreed 87-month sentence. Noting that the stipulated sentences were significantly lower than the advisory U.S. Sentencing Guidelines for the charged offenses, the District Court rejected the plea agreement, and Ciavarella and Conahan withdrew their guilty pleas. Shortly thereafter, a grand jury returned a 48-count Indictment. Ciavarella proceeded to trial, was found guilty of twelve counts against him and was ultimately sentenced to 336 months' imprisonment, as well as restitution, forfeiture, and a special assessment. This appeal ensued. With the exception of Count 7 for honest services mail fraud, we will affirm the judgments of conviction and sentence on all counts. We will remand to the District Court to modify the judgment with respect to the special assessment as to Count 7.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Replacement of the Existing County-Run Juvenile Detention Center

Ciavarella served on the Luzerne County Court of Common Pleas from 1996 through January 2009. He primarily served on the Juvenile Court, and in January 2007, was named President Judge of the Court, succeeding Judge

Michael Conahan who had served as President Judge since January 2002.

The circumstances relating to the various counts in the Indictment began in 2000. That year, Ciavarella and Conahan, along with other county officials, began expressing concerns about the serious disrepair and deplorable conditions at the Luzerne County Juvenile Detention Facility. Some county officials wanted to build a new county-run detention center, but Ciavarella advocated for the construction of a private facility, which could then be leased to the county. Ciavarella along with Conahan helped bring together potential investors for this project, including Robert Powell, a lawyer and friend of Conahan, and Robert Mericle, a local commercial builder and friend of Ciavarella. Powell and his business associate, Greg Zappala, ultimately created Pennsylvania Child Care, LLC ("PACC") to develop the new private juvenile detention center, and Powell hired Mericle Construction Company to build it. In July 2001, Mericle informed Ciavarella that he would pay him a referral fee of 10% of the contract price, and Ciavarella asked him to make the payment through Powell. Ciavarella and Conahan agreed to split the payment because Conahan "put the deal together." App. 1205.

## B.    Kickbacks to Ensure Completion of the Juvenile Detention Center

As part of the plan to help Powell and Mericle ensure completion of the project, Ciavarella and Conahan engaged in various endeavors to stymie the county's efforts to build and operate its own facility. Most critically, when Powell had trouble securing financing for construction in late 2001, Ciavarella and Conahan agreed to create a lease between

PACC and Luzerne County to secure a bank loan. The judges agreed that Conahan would sign a lease in January 2002, after he became President Judge and would have the authority to bind the county. The lease, which the judges prevented any county officials from seeing, committed the county to pay $1.314 million per year to PACC in exchange for PACC housing the county's juvenile offenders.

In February 2002, after Powell secured financing, Mericle and PACC finalized a construction contract, which included an agreement that Mericle would pay a $997,600 referral fee after he completed construction of the facility. It was Mericle's understanding that he would make the payment to Powell, but that Ciavarella would be the ultimate recipient. In January 2003, when construction was nearing completion, Conahan provided Powell with wire transfer instructions. Pursuant to the instructions, Mericle transferred the referral fee to Conahan and Ciavarella through a series of transactions between multiple individuals and companies to ensure the funds were not traceable. While Mericle Construction reported the payment for tax purposes, Ciavarella never reported the income.

After PACC began operations, Powell and Mericle worked to develop a second juvenile detention center, Western PA Child Care (WPACC), and expand PACC from 48 beds to 60 beds. Ciavarella received referral fees for each of these projects. In July 2005, Mericle paid Ciavarella a $1 million referral fee for WPACC and in February 2006, Mericle paid Ciavarella a $150,000 referral fee for the PACC expansion. Mericle received the instructions from Ciavarella and made the payment by transferring funds to the Pinnacle Group of Jupiter, LLC, a corporation that Ciavarella,

Conahan, and their wives formed in January 2004. Altogether, Mericle paid $2,147,600 in referral fees to Ciavarella and Conahan.

### C.    Ensuring Success for the New Detention Centers

In January 2002, Conahan appointed Ciavarella to the Juvenile Court, a position that Ciavarella leveraged to place juvenile offenders with PACC to perpetuate the scheme. Months earlier, the outgoing President Judge had removed Ciavarella from the Juvenile Court and appointed himself, but when Conahan became President Judge, Conahan instead reappointed Ciavarella to that position as Juvenile Court Judge. By February 2003, PACC had begun operating, and Ciavarella started keeping regular tabs on how many beds were utilized at any given time. In November 2003, Ciavarella and Conahan called Powell into a meeting to discuss how many juveniles Ciavarella had sent to PACC and what the county had paid PACC for housing the juveniles. In 2003, alone, Ciavarella detained more than 100 juveniles at PACC. Based on this information and on a cursory estimate of PACC's profits, Ciavarella concluded that PACC was "doing very, very well" and that he "want[ed] a part of it." App. 532-33. After Powell responded with concerns about cash flow, Ciavarella said "he didn't care . . . [and] want[ed] to be paid" his share. App. 535-36. The judges told Powell that they had formed the Pinnacle Group and would use it to purchase a condo, and Powell could use it to make "rent" payments. In February 2004, Pinnacle purchased an uninhabitable condo in Jupiter, Florida. From January to September 2004, Powell sent $590,000 in numerous personal and business checks to Pinnacle, identified as payments for

rent and marina fees, financed through Powell's draws on PACC and his law firm, which he kept hidden from his business partner Zappala.

In July 2005 and February 2006, Ciavarella and Conahan received referral fees from Mericle for the construction of WPACC and expansion of PACC. Both payments were funneled through several conduits. Shortly thereafter, Ciavarella and Conahan again pressured Powell to make more payments. In June 2006, the judges called Powell into another meeting to discuss how much money Ciavarella had made for Powell by detaining juveniles at PACC and WPACC. For the year 2005, Ciavarella had detained more than 100 juveniles at PACC and had begun placing juveniles at WPACC. The judges told Powell, "Look, you're in this business, we helped you get into it, you're making a lot of money, you're going to give us some." App. 568. Powell testified that he "wasn't paying them for any services rendered, [but] was paying them because they demanded it in their position of authority." App. 568. Despite his reluctance, Powell began working with his law firm's Chief Financial Officer, Pat Owens, to structure transactions to withdraw large sums of cash from his law firm and from PACC and WPACC. From August to December 2006, Powell made cash payments totaling $143,500 to Ciavarella and Conahan through boxes filled with cash delivered by Powell and his law partner, Jill Moran, to Conahan and his judicial aide.

### D.    Failure to Disclose Conflicts of Interest

Ciavarella and Conahan perpetuated their scheme by failing to disclose their receipt of payments from Mericle and Powell. Also, while obligated by Pennsylvania law to file

financial interest statements reporting on outside income, from 2003 through 2007, Ciavarella and Conahan filed false statements and failed to report their outside income, financial interests, or gifts related to PACC, Powell, or Mericle. Additionally, though they were ethically required to disclose their financial relationships with parties in cases in which they presided over as judges, and required to recuse themselves from such cases, Ciavarella and Conahan repeatedly failed to disclose their financial relationships with Powell, Mericle, PACC, and WPACC despite presiding over several trials in which they were litigants between 2004 and 2008.

Furthermore, Ciavarella never disclosed his conflict of interest with the juvenile detention centers when he presided over the cases of juvenile offenders and committed them to detention at PACC or WPACC. In many cases, with the intent of increasing his personal gain, Ciavarella disregarded the recommendation of juvenile probation officers evaluating the juvenile offenders' cases and ordered their detention. Ciavarella also exerted pressure on the staff of the Court of Common Pleas to recommend the detention of juvenile offenders, and on certain occasions, as a result of pressure from Ciavarella, probation officers changed their recommendations from release of the juveniles to recommendations of detention.

Following the discovery of this scheme, a special master was appointed by the Pennsylvania Supreme Court to review the cases of juveniles who were not represented by an attorney and were committed to PACC and WPACC by Ciavarella. The special master indicated that "a very substantial number" of the juveniles did not knowingly or

intelligently waive their right to counsel. Confidential Presentence Report ("PSR") ¶ 103. The investigation also revealed "that there was routine deprivation of children's constitutional rights to appear before an impartial tribunal and to have an opportunity to be heard." PSR ¶ 103.

### E.    Ciavarella's Obstruction of Justice

In 2007, Ciavarella, Conahan, and Powell learned that they were under criminal investigation when they heard that witnesses had received grand jury subpoenas. Ciavarella met with Mericle in November 2007 to let Mericle know that Ciavarella could go to jail if Mericle reported that he had paid Ciavarella a referral fee through Powell. Ciavarella also encouraged Mericle to destroy records.

After learning about Mericle's testimony before a grand jury, in January 2008, Ciavarella and Conahan met with Powell to coordinate their "stories." PSR ¶ 45. They instructed Powell to testify that he had never given them any boxes of cash. But by the summer of 2008, Powell had begun cooperating with investigators and wore a recording device during his conversations with Ciavarella and Conahan. In a July 2008 conversation, Ciavarella, Conahan, and Powell discussed how to discredit any testimony by Powell's law partner Jill Moran if she reported her delivery of Powell's cash to Conahan.

### F.    The Indictment and Prosecution

In January 2009, Ciavarella and Conahan were charged with honest services wire fraud and conspiracy. Both subsequently pleaded guilty before District Judge Edwin M.

Kosik of the District Court for the Middle District of Pennsylvania, conditioned upon the Court's acceptance of binding plea agreements with a stipulated 87-month sentences. As noted above, Judge Kosik rejected the plea agreements because of his concern that the stipulated sentences were far below the Guidelines for the charged offenses. He also cited the Probation Office's presentence report prepared in connection with his review of the plea agreements, which represented that Ciavarella had continued to publicly deny receipt of money in exchange for committing juveniles to detention, despite the contradictory offense conduct proffered by the Government. Ciavarella also essentially denied committing juveniles in exchange for money at the plea hearing. Ciavarella and Conahan then withdrew their pleas, and in September 2009, a grand jury returned a 48-count Indictment against Conahan and Ciavarella.[2] Conahan eventually pleaded guilty to racketeering conspiracy and received a 17-year sentence.

Ciavarella's trial began in February 2011. Throughout the trial, Ciavarella sought to demonstrate that Mericle's payments were legitimate referral fees and not bribes or kickbacks. Specifically, he argued that there was no *quid pro quo*, that is, no agreement that Ciavarella was sending juveniles to PACC and WPACC in exchange for payments from Powell. As part of this defense, Ciavarella sought to prove that Powell was embezzling from his law firm and the detention centers in order to support his lavish lifestyle rather

---

[2] On September 29, 2010, a superseding Indictment was returned against Ciavarella containing the same charges but with revised language to conform with *Skilling v. United States*, 130 S. Ct. 2896 (2010).

than to pay kickbacks to Ciavarella. Nevertheless, on February 18, the jury found Ciavarella guilty of 12 charges: racketeering (Count 1), racketeering conspiracy (Count 2), four counts of honest services mail fraud (Counts 7, 8, 9, and 10), money laundering conspiracy (Count 21), conspiracy to defraud the United States (Count 35), and four counts of subscribing to a materially false tax return (Counts 36, 37, 38, and 39). Ciavarella was acquitted of honest services wire fraud, bribery, money laundering, and extortion. Thereafter, the District Court sentenced Ciavarella to 336 months of imprisonment and 3 years of supervised release and ordered Ciavarella to pay restitution in the amount of $1,173,791.94, to forfeit $997,600, and to pay a special assessment of $1,200.

## II.    ANALYSIS

Ciavarella raises several issues on appeal, addressing a host of challenges to the sufficiency of the evidence, the timeliness of his prosecution, the impartiality of the District Judge, the admissibility of evidence, and his sentence.[3] We will address each of Ciavarella's arguments in turn.

### A.    Ciavarella's Recusal Motions

Ciavarella challenges the denial of his three motions to recuse Judge Kosik. His initial recusal motions were premised on Judge Kosik's pretrial conduct, and his last motion was

---

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

predicated on the opinions expressed by Judge Kosik in his responses to letters from the public.[4]

### 1.    Statements in Citizens Voice Article

In July 2009, months after Ciavarella and Conahan entered guilty pleas, Powell also pleaded guilty before District Judge Kosik. During Powell's plea hearing, the District Court asked Powell whether there was "underlying consideration for the payments which was part and parcel with the concealment of the payments." App. 29. The District Court's question was in response to media reports about Ciavarella and his claim that he never detained juveniles in exchange for money. Powell responded that "there was no *quid pro quo* per se," that is, no detention of juveniles in exchange for payments, and that he had only acted as a conduit for Mericle's referral fees. App. 29. One month later, the District Court rejected Ciavarella's and Conahan's plea agreements.

Days after the District Court rejected the plea agreements, the *Citizens Voice* newspaper published an article, which purported to detail a conversation between Judge Kosik and another individual that the reporter had overheard outside of the courtroom minutes after Powell's guilty plea. The article reported:

-----------------------

[4] We review the District Court's denial of Ciavarella's recusal motions for abuse of discretion. *Johnson v. Trueblood*, 629 F.2d 287, 290 (3d Cir. 1980).

> Kosik stood near an elevator outside his
> courtroom and casually discussed what had just
> happened therein, including an attempt by
> Powell's attorney to portray some payments to
> the judges as a "finder's fee"—not as an
> incentive for them to sent a steady stream of
> juveniles to the detention facilities co-owned by
> Powell. . . .

> How could there not have been a *quid pro
> quo*?" Kosik wondered, portending the
> sentiments he expressed Friday in a five-page
> memorandum rejecting plea agreements
> between former Luzerne County Judges Mark
> A. Ciavarella Jr. and Michael T. Conahan and
> federal prosecutors.

> The evidence of Ciavarella and Conahan's
> judicial prostitution—of their so-called kids for
> cash scheme—was abundant and clear, Kosik
> continued. . . .

App. 71. The article went on to quote repeatedly, with and
without attribution, from the District Court's opinion
rejecting Ciavarella's plea agreement.[5]

---

[5] The *Citizens Voice* article reported that Kosik said,
"Conahan, pounding the same callous, iron fist he used to
force the county's use of the private facilities in 2003,
'attempted to obstruct and impede justice, and failed to
clearly demonstrate affirmative acceptance of responsibility
with this denials and contradictions of evidence.'" App. 71.
The article went on say Kosik referenced Conahan's "denials

After withdrawing his guilty plea, Ciavarella moved to disqualify Judge Kosik on the grounds that Judge Kosik had improperly relied on extrajudicial statements—including media reports and Ciavarella's presentence report—in denying the plea agreement, and that Judge Kosik's statements reported in the *Citizens Voice* article could be perceived as comments on the merits of the case and on Ciavarella's guilt. The District Court denied the recusal motion.

Under 28 U.S.C. § 455(a), a judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned." "The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so." *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994). To ensure the integrity and impartiality of the judiciary, judges must scrupulously avoid making public comments on pending litigation. *See* Code of Conduct for United States Judges (hereinafter "Code of Conduct") Canon 3A(6) (Judicial Conference 2009) ("A judge should not make public comment on the merits of a matter pending or impending in any court.").

---

concerning his alleged offenses, 'including the receipts of money.'" App. 72. The article also noted that Kosik "bristled" that Ciavarella "'has resorted to public statements of remorse, more for his personal circumstances. . . . Yet he continues to deny what he terms "quid pro quo" his receipt of money as a finder's fee.'" App. 72. Each of these statements that the *Citizens Voice* article attributes to statements by Judge Kosik is contained in the District Court's opinion rejecting Ciavarella's and Conahan's plea agreements. App. 21-22.

Ciavarella urges us to rely on the First Circuit's approach in *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001). There a district judge had spoken with a newspaper reporter about a pending case, and the Court held that because the case involved a "matter of significant local concern" and because the judge's "comments were sufficiently open to misinterpretation so as to create the appearance of partiality, even when no actual prejudice or bias existed," recusal was warranted under 28 U.S.C. § 455(a). *Id.* at 169, 170.

This case, however, is different. Unlike in *Boston's Children First*, it is not clear whether the comments attributed to Judge Kosik were ever actually made by him outside the context of a judicial proceeding. The *Citizens Voice* article implied that a reporter overheard Judge Kosik "casually discuss[ing] what had just happened" at Powell's plea hearing and "wonder[ing]" how there could "not have been a '*quid pro quo*?'" App. 71. But despite the reporter's implication that the statements had been made outside the courtroom, every statement attributed to Judge Kosik had in fact been expressed by him in his judicial opinion rejecting Ciavarella's and Conahan's plea agreements or in the courtroom during Powell's plea hearing. In fact, in its opinion denying the recusal motion, the District Court denied ever having spoken with the media regarding a case or person charged and compared the *Citizens Voice* article with its July 31, 2009 opinion. Judge Kosik stated that "[t]he article's sources were not extra-judicial, but [were] quoted from judicial filings." App. 30. We agree. For this reason, Ciavarella's reliance on *Boston's Children First* is unavailing.

Nor do Judge Kosik's statements in his July 31, 2009 opinion and at Powell's plea hearing warrant recusal on the basis that they gave an appearance of partiality. *Cheney v. United States District Court for the District of Columbia* is illustrative. In *Cheney*, Justice Scalia issued an opinion responding to a motion for recusal based on a trip and flight that he had taken the year before with Vice President Cheney. The recusal motion cited to newspaper articles, and Justice Scalia responded to correct inaccuracies and state that "largely inaccurate and uninformed opinions cannot determine the recusal question." *Cheney*, 541 U.S. 913, 924 (2004) (Scalia, J., mem.). To the contrary, "the recusal inquiry must be 'made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances*.'" *Id.* (quoting *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J., mem.) (citing *Liteky*, 510 U.S. at 548)).

Here, too, no reasonable person who is informed of all of the facts would believe that Judge Kosik's impartiality could be questioned based on the statements in the proceedings as reported in the *Citizens Voice* article. The statements Judge Kosik made during Powell's plea colloquy and in the District Court's opinion rejecting Ciavarella's plea agreement were based on the knowledge he gained over the course of judicial proceedings. "[O]pinions formed by the judge on the basis of . . . prior proceedings[] do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Ciavarella has failed to demonstrate such a "deep-seated favoritism or antagonism." *Id.* To the contrary, Judge Kosik's statements were merely "assessments relevant to the case, whether they

are correct or not." *United States v. Wecht*, 484 F.3d 194, 220 (3d Cir. 2007). "As such, they do not demonstrate bias, even if they are 'expressions of impatience, dissatisfaction, [or] annoyance.'" *Knoll v. City of Allentown*, 707 F.3d 406, 411 (3d Cir. 2013) (quoting *Liteky*, 510 U.S. at 555) (alteration in original).

Finally, we note that under § 455(a), "[d]iscretion is confided in the district judge in the first instance to determine whether to disqualify himself because the judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion," particularly when "the district court judge has presided over (i) an extraordinarily complex litigation (ii) involving a multitude of parties (iii) for an extended period of time." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 224 (3d Cir. 2003) (internal quotation marks, citation and alterations omitted). Here, at the time of Ciavarella's initial March 1, 2010 recusal motion and subsequent renewals of that motion, Judge Kosik had presided over Ciavarella's highly complex case for well over a year, and over many of Ciavarella's co-conspirators' cases, and he was well-suited to understand the implications of the *Citizens Voice* article. We find no abuse of discretion in the District Court's denial of the recusal motions.

2.    Information Received by the District Court Prior to Rejecting Plea

Ciavarella next contends that Judge Kosik's recusal was also warranted following the rejection of Ciavarella's guilty plea. He argues that Judge Kosik relied on the presentence report during his plea hearing, which contained

factually disputed evidence,[6] to prejudge both the strength of the Government's case and Ciavarella's guilt. He also asserts Judge Kosik considered media reports as support for his conclusion that Ciavarella "has resorted to public statements of remorse, more for his personal circumstances, yet he continues to deny what he terms '*quid pro quo*' his receipt of money as a finder's fee." App. 21.

But Ciavarella has not pointed to any extrajudicial source on which the District Court relied. Rather, his denials of sending juveniles to detention for money were contained in the record, including in Ciavarella's plea colloquy stating that he was "not in complete agreement at this time on all of the facts alleged in the Information." Supp. App. 60-61. As we recently stated, "[t]o warrant reassignment under § 455(a), a case generally must involve apparent bias deriving from an extrajudicial source, meaning something above and beyond judicial rulings or opinions formed in presiding over the case." *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012). As there is no showing of extrajudicial sources that Judge Kosik relied on, Ciavarella's argument fails.

Nor can the District Court's ability to preside impartially over the remaining jury trial be questioned due to its exposure to the presentence report. We have never held that a judge must recuse him or herself after viewing a presentence report and rejecting a plea. To the contrary, we have recognized that "circumstances often may arise when

---

[6] Because Ciavarella did not object to the presentence report when given the opportunity to do so, his contention that it contained factually disputed evidence is not properly before us.

the judge views a defendant's presentence report for legitimate purposes before trying him or presiding over his trial." *United States v. Small*, 472 F.2d 818, 822 (3d Cir. 1972). Furthermore, "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky*, 510 U.S. at 551. Ciavarella fails to demonstrate any sufficient basis for recusal.

3.    Judicial Response to Citizen Letters

In response to media requests and prior to sentencing, the District Court disclosed that it had received nearly 200 letters from the public regarding the case and authored seven letters in response to some of those letters. In disclosing the public's letters, the District Court stated that it had "not read or considered, nor will it read or consider, the bulk of such materials in determining the sentence to be imposed [on Ciavarella]." App. 42. The Court then publicly released all of the letters, with the exception of those requesting confidentiality. The seven responses that Judge Kosik sent contained the following statements:

February 20, 2009 . . .

Thank you for your letter and expressed concerns over the corruption which has come to light in Luzerne County, and most seriously with the courts.

My personal opinions are in complete sympathy with those you express. The only difference is

that my personal beliefs cannot guide my responsibility and judgments.

As you know, the government has entered into an agreement with the defense with regard to the sentence which is binding if neither side rejects it. According to the government, this resulted because of the legally questionable Count I of the indictment. To proceed, it would result in litigation and appeals which could extend any finality in the case for at least one year. I need to determine if the government's reasoning is correct, and I must do so as detached as possible.

I am not sure we have seen the end of many transgressions in your county.

App. 1507 (hereinafter "Wojack response").

March 2, 2009 . . .

Thank you for your letter and frank expressions. If personal opinions were our only guide, we are on the same page. . . .

The prosecution stated the plea bargain was reached because of some legal uncertainties in a law which prohibits corrupting public service. To litigate the uncertainties before finality would result in extending the presumption of innocence for a least a year. Accordingly, they

claim to have been guided by the need of closure.

App. 1510.

July 16, 2009 . . .

Thank you for your note concerning the pending case before me. I appreciate your views and hope that ultimately you can respect the final consideration in the case before me.

App. 1518.

July 23, 2009 . . .

Thank you for your letter of July 21 concerning the case of two judges out of Luzerne County.

Your sentiments are noted. However, I have yet to receive a pre-sentence report which will aid in making a decision.

App. 1516.

Feb. 24, 2010 . . .

Thank you for your letter . . . voicing your concerns regarding Judge Michael Conahan.

This is just another example of why Judge Conahan and his cohort have been indicted and expect to go to trial in the federal criminal case.

App. 1512.

> May 6, 2010 . . .
>
> I thank you for the letter expressing interest in and opinions concerning the judicial process as it may play out in the case of former Judge Conahan.
>
> I appreciate your views and hope that ultimately you can respect the final consideration in the case before me.

App. 1520.

> June 15, 2010 . . .
>
> Thank you for your letter dated April 30, 2010, and received by me on June 14, 2010. I am sorry justice is so slow, but ultimately I hope you find it to be true.

App. 1514. Ciavarella renewed his prior recusal motion based on these letters.

When a sitting judge comments on a pending case, he or she should heed the clear tenets expressed in our Code of Conduct for United States Judges. Judges should adhere to the following standards:

> [3A(1)] A judge should be faithful to, and maintain professional competence in, the law

and should not be swayed by partisan interests, public clamor, or fear of criticism. . . .

[3A(6)] A judge should not make public comment on the merits of a matter pending or impending in any court. A judge should require similar restraint by court personnel subject to the judge's direction and control. The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education. . . .

[3C(1)(a)] A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: [] the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

Code of Conduct Canon 3. Given the Canon's clarity, we emphasize that writing letters to non-parties about a case during its pendency is highly discouraged.[7]

---

[7] Nonetheless, we recognize that the "Code is designed to provide *guidance* to judges," and adherence is not mandatory. Code of Conduct Canon 1 cmt. (emphasis added). Furthermore, "it is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for

The inquiry here, however, is whether Judge Kosik's conduct violates 28 U.S.C. § 455(a) and triggers a duty to recuse. We have carefully analyzed the contents of each letter and are troubled by the correspondence and the expressions of Judge Kosik's thoughts on Ciavarella and his conduct. Nevertheless, though Judge Kosik's personalized responses to any letters from the public was ill-advised, their contents do not mandate his recusal because no reasonable person would question Judge Kosik's impartiality under these unique circumstances. Nor does our review of the record show anything other than proceedings conducted by a fair and impartial jurist.

We find that the letters fall into three categories: (1) those in which Judge Kosik expressed his personal opinion about the case but clearly stated that those opinions could not affect his judgments; (2) those in which Judge Kosik never expressed an opinion but stated that he "appreciated" the recipient's viewpoint; and (3) those where Judge Kosik neither expressed an opinion nor took note of the recipient's comments but responded with the status of the case. The second and third groups of letters abide by the Code of Conduct's standards because they merely provided "explanations of court procedures," Code of Conduct 3A(6), and took "particular care so that the comment does not denigrate public confidence in the judiciary's integrity and impartiality." Commentary to Code of Conduct Canon 3A(6). No reasonable person could question Judge Kosik's impartiality based on these letters.

---

a judge to comply with the Code yet still be required to recuse herself." *Boston's Children First*, 244 F.3d at 168.

The first category of letters, however, causes us greater concern because the letters in that category contain Judge Kosik's personal opinions about Ciavarella and the case before him. Because Ciavarella must only demonstrate that Judge Kosik appears to be biased, *see Liteky*, 510 U.S. at 553 n.2, we must consider whether a reasonable person might question Judge Kosik's impartiality based on the opinions expressed in this correspondence. As the Supreme Court has stated, when a judge's opinion is formed by the proceedings before him, his opinions do not constitute bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555. Because, as noted, Judge Kosik's opinions did not result from any extrajudicial source, but from events occurring in the course of proceedings, for recusal to be warranted, Ciavarella must meet *Liteky*'s high bar of deep-seated antagonism. We conclude that Ciavarella has failed to do so given that in each letter in which Judge Kosik expressed his opinion, he also expressly stated that his personal opinion would not guide his rulings. This stands in stark contrast to *United States v. Antar*, where we required recusal of a district judge who commented at the sentencing hearing that his "object in this case from day one ha[d] always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." 53 F.3d 568, 573, 579 (3d Cir. 1995), *abrogated on other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). Judge Kosik's comments do not "display [the] high degree of antagonism" we found in *Antar*. *Id.* at 576.

At oral argument, defense counsel cited the response to Wojack as most exemplary of Judge Kosik's perceived bias and apparent partiality. Wojack had written to Judge Kosik to

"search the deepest veins of [his] soul and find reason not to let these two judges off lightly," pleading that "[s]even and a third years and some forfeiture of wealth is not severe enough punishment to begin the healing of the public trust." App. 1506. Wojack said that Ciavarella and Conahan had "committed the most serious crime against the people" by using their courtrooms as "a business for profit at the expense of children." App. 1506. The defense contends that Judge Kosik's response evidenced his partiality. This view, however, requires consideration of only certain sentiments expressed—"My personal opinions are in complete sympathy with those you express" and "I am not sure we have seen the end of many transgressions in your county"—while disregarding others—"The only difference is that my personal beliefs cannot guide my responsibility and judgments" and "I need to determine if the government's reasoning is correct, and I must do so as detached as possible." Wojack response. As the Supreme Court noted in *Liteky*, "[i]mpartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky*, 510 U.S. at 551 (internal quotation marks and citations omitted). Viewing Judge Kosik's statements in the Wojack correspondence as a whole, no reasonable observer who is informed of all of the surrounding facts and circumstances would believe that Judge Kosik could not, and did not, act impartially. Recusal was not required.

4.    Overall Perception of Bias

Finally, Ciavarella contends that "the totality of Judge Kosik's pre-trial and trial conduct conveyed a message that he loathed Ciavarella and believed that he accepted bribes, thus

warranting disqualification." Ciavarella's Br. at 22. We must consider whether recusal is warranted considering the totality of the circumstances involved in the proceedings. *See, e.g.*, United *States v. Kennedy*, 682 F.3d 244, 259-60 (3d Cir. 2012).

Viewing the record in its entirety, it appears that Judge Kosik had serious concerns about Ciavarella's alleged conduct. In his correspondence, in the Memorandum rejecting Ciavarella's plea agreement, and in his denial of the initial recusal motion, Judge Kosik expressed his belief that Ciavarella's conduct amounted to "corruption," Wojack response, that the undisputed evidence showed that Ciavarella committed the county to housing juvenile offenders "under circumstances amounting to constitutional deprivations," App. 29, and that due to Ciavarella's conduct, "confidence in the judicial system . . . may be corrupted for a time well after this case." App. 22. Yet a judge's negative view of a defendant based on evidence in the record does not constitute actual or apparent bias for the purpose of a recusal motion.

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. . . . Also not subject to deprecatory characterization as 'bias' or 'prejudice' are

28

> opinions held by judges as a result of what they
> learned in earlier proceedings.

*Liteky*, 510 U.S. at 550-51. Here, any negative views that
Judge Kosik had of Ciavarella do not arise from extrajudicial
source and do not amount to the extreme animus necessary to
make fair judgment impossible. *See id.* at 555. Rather, they
arose from the very matters presented to him, especially in the
setting of the rejected plea agreement wherein Ciavarella
essentially admitted the underlying conduct later found by the
jury to be criminal. For these reasons, we hold that there was
no abuse of discretion in the District Court's denial of the
recusal motions.

### B.    AUSA Zubrod's Statements as a Party Admission

Ciavarella contends that the District Court erred by
excluding statements made by Assistant U.S. Attorney
Gordon Zubrod at Mericle's plea hearing, arguing that the
evidence would have reinforced Ciavarella's defense that the
payments were not bribes or kickbacks.[8]

Following presentation of the Government's case-in-
chief, Ciavarella sought to admit the following statement by
Zubrod made at Mericle's plea hearing.

---

[8] We review the District Court's decision to exclude
evidence for abuse of discretion. *United States v. Bobb*, 471
F.3d 491, 497 (3d Cir. 2006). "However, to the extent the
District Court's admission of evidence was based on an
interpretation of the Federal Rules of Evidence, the standard
of review is plenary." *Id.*

> Referral fees are a common place practice. . . .
> Fee splitting between the parties, for example,
> between Judge Ciavarella and Mr. Powell, that
> kind of fee splitting is also a common practice
> in the real estate business. . . .
>
> This is not a kickback or a bribe in any sense. It
> is a common practice. It is not a legal *quid pro
> quo*. It is a common practice between
> businessmen in real estate transactions. Mr.
> Mericle simply paid a finder's fee to the judges
> in accordance with standard practice. To him,
> his payment of the fee was what he had done
> hundreds of times before and was not related to
> the office that the judges held or any decisions
> by the judges. . . .

App. 1537. In response, the District Court sought to clarify
that Zubrod's description of referral fees addressed only
Mericle's state of mind and not the intent of other
participants. The Court inquired:

> THE COURT: What you're suggesting is that
> any relationship Mr. Mericle had to the juvenile
> centers that were constructed by him or his
> company was entirely different than any
> relationship that may have existed between Mr.
> Powell and the two judges that you were
> referring to; is that correct?
>
> MR. ZUBROD: That's correct . . . . [Powell]
> understood it to be a *quid pro quo* that he would

not get juveniles anymore if he didn't pay up the money. . . .

THE COURT: [I]t's my recollection that in the case of the two judges you represented that there was a *quid pro quo* between Mr. Powell and between the judges. That is not the case [as to Mericle's intent]; is that correct?

MR. ZUBROD: That's correct, Your Honor. There's no *quid pro quo*.

App. 1539.

Ciavarella argued that Zubrod's statement was a party admission that Mericle's payments were not a bribe or kickback but were permissible referral fees. The District Court refused to allow the statements to be used as party admissions but permitted Ciavarella to represent that the statements supported Mericle's mental state concerning the payments.

Federal Rule of Evidence 801(d)(2)(A) permits the admission of statements made by a party opponent. Ciavarella argues that "[t]he rule simply requires that the admission at issue be contrary to a party's position at trial." Ciavarella's Br. at 30.[9] We must consider whether the Government has

---

[9] We have stated that "[t]o be admissible [under Rule 801(d)(2)], a party's admission 'must be contrary to that party's position at the time of the trial.'" *United States v. Ferri*, 778 F.2d 985, 991 (3d Cir. 1985) (quoting *Butler v. S. Pa. Co.,* 431 F.2d 77, 80 (5th Cir. 1970)). However, other

adopted inconsistent or mutually contradictory positions in its successive series of suits against Mericle and Ciavarella. Zubrod's statement only referred to Mericle's intent about the payments and not the intent or state of mind of Ciavarella, Conahan, or Powell, which was the focus of the Government's case against Ciavarella. Zubrod stated that Powell "understood it to be a *quid pro quo*," while to Mericle, his payment was a fee and was "standard practice," not a "*quid pro quo*." App. 1539. Thus, the Government's position at Ciavarella's trial—that Ciavarella ordered juvenile offenders to detention in exchange for money—is neither an inconsistent nor a mutually contradictory position from its theory at Mericle's plea hearing. Accordingly, we find no abuse of discretion in the District Court's exclusion of Zubrod's statements at Mericle's plea hearing.[10]

---

courts have addressed whether the admission must be against the party's interest and have concluded that Rule 801(d)(2)(A) contains no such limitation. *See, e.g.*, *United States v. McGee*, 189 F.3d 626, 632 (7th Cir. 1999) (citing cases). Because Ciavarella only argues that Zubrod's statements should have been admissible because they were contrary to the Government's position at trial, we need not address whether to relax our limitation on the admissibility of a party opponent's statements.

[10] Moreover, under the District Court's ruling, Ciavarella could have introduced Zubrod's statement through Mericle's cross-examination.

### C.    Cross-Examination of Powell and Owens

Ciavarella contends that the District Court violated his Sixth Amendment right of confrontation when it limited his cross-examination of Powell and Powell's CFO, Patrick Owens, on substantial facts in controversy that went to the core of his defense and undermined Powell's credibility.[11] To determine whether limitations on cross-examination violate the Confrontation Clause, we employ the following two-step test:

> First, we must determine whether that ruling significantly inhibited [a defendant's] effective exercise of her right to inquire into [the] witness's "motivation in testifying"; and second, if the District Court's ruling did significantly inhibit [the defendant's] exercise of that right, whether the constraints it imposed on the scope of [the] cross-examination fell within those "reasonable limits" which a trial court, in due exercise of its discretion, has authority to establish.

---

[11] We review the District Court's limitations on cross-examination based on relevancy for abuse of discretion. *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008). We review for plain error objections that were not specifically raised before the District Court. *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010) (applying plain error review for claim that admission of testimony violated the Confrontation Clause).

*United States v. Chandler*, 326 F.3d 210, 219 (3d Cir. 2003).

Ciavarella sought throughout the trial to portray Powell as a large and powerful figure, who was incapable of being extorted by Ciavarella and instead was embezzling from his companies to support his lavish lifestyle. The defense inquired into Powell's credit card statements, confronting him about a December 2003 statement containing over $21,000 in charges, a January 2004 statement containing over $13,000 in charges, and a February 2004 statement containing over $15,000 in charges. After the questioning of Powell about his third credit card statement, the District Court asked the defense about the relevance of the line of questioning and subsequently sustained an objection by the Government.

Ciavarella also attacked Powell's credibility through the testimony of Owens regarding Powell's demeanor and his structuring of transactions. Owens testified that Powell's demeanor changed in 2006 and 2007 and that Powell had become paranoid, quick tempered, and demanding. Around that time, according to Owens, Powell had directed Owens to withdraw large amounts of cash from Powell's companies. The defense on cross-examination sought to demonstrate that it was Powell's embezzlement from his companies that had led to his changed demeanor and not Ciavarella's alleged extortion demands. However, after Ciavarella had asked Owens about Powell's business partner Greg Zappala's lack of knowledge of Powell's withdrawals from the companies they jointly owned, the District Court inquired as to the relevance of Powell's embezzlement, prompting an objection from the Government that the District Court sustained. The Government then conceded that "[t]he issue of paranoia,

however, as a motive separate from the extortion may be marginally relevant." App. 729. Nevertheless, the District Court maintained its ruling.

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "*Van Arsdall* requires us to strike a balance between the constitutionally required opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination." *United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991).

Although Ciavarella initially argued at trial that Powell's testimony addressing his credit card statements was relevant to the defense's theory that Powell's lavish lifestyle made him incapable of being extorted, on appeal, Ciavarella now argues that the evidence was relevant instead to show that Powell was embezzling from his companies to support his lifestyle. However, Ciavarella failed to demonstrate either at trial or on appeal any different conclusion that the jury might have reached had it learned more about Powell's specific spending habits, and thus we cannot conclude that the District Court abused its discretion. Regarding Owens's testimony, while we agree that evidence related to Powell's change in demeanor and structuring of transactions may have been relevant to support Ciavarella's argument that Zappala did not know that Powell was stealing from their companies, we hold that the District Court did not abuse its discretion in excluding this evidence. Ciavarella had already questioned

Owens about Zappala's lack of knowledge about Powell's withdrawals from his companies, and further questioning would have been repetitive. Ciavarella has not explained what the jury may have learned from further testimony on Powell's withdrawals. As "the Confrontation Clause does not grant unfettered rights to cross-examine witnesses," *United States v. Friedman*, 658 F.3d 342, 356 (3d Cir. 2011), we conclude that the District Court's ruling "fell within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish." *Chandler*, 326 F.3d at 219.

### D. Use of Evidence of Ciavarella's and Conahan's Conflicts of Interest

Ciavarella argues that the District Court erred under Federal Rule of Evidence 404(b) by admitting evidence that demonstrated that he and Conahan failed to disqualify themselves in certain lawsuits over which they presided. Ciavarella argues that this evidence was not relevant, failed to assist the jury in understanding whether the payments were bribes or part of a scheme to defraud, and that even if relevant, was unfairly prejudicial.[12] Even if we assume Ciavarella is correct that Rule 404(b) applies in this instance because extrinsic offense evidence is at issue,[13] we find no abuse of discretion.

---

[12] We review the District Court's admission of Rule 404(b) evidence for abuse of discretion, and "the district court has significant leeway in reaching its decision." *United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994).

[13] The Government maintains that the District Court correctly ruled that the evidence is "intrinsic evidence of

The Government sought to introduce evidence under Rule 404(b) that Ciavarella and Conahan failed to disqualify themselves or disclose their conflicts of interest in cases over which they presided involving Mericle, Powell, PACC, and WPACC as litigants. The American Bar Association's Model Code of Judicial Conduct requires all judges to either disqualify themselves from or disclose their interest in proceedings in which their impartiality may be questioned due to their economic interest in the subject matter in controversy. Model Code of Judicial Conduct R. 2.11 (2011). "Almost every State . . . has adopted the American Bar Association's objective standard . . . ." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 888 (2009).[14] Ciavarella testified that though he knew of the affirmative duty to disqualify himself in certain cases, he failed to do so. Multiple attorneys that represented opposing parties in cases

---

Ciavarella's guilt on the honest services fraud counts." Gov't Br. at 47. "Rule 404(b) does not extend to evidence of acts which are 'intrinsic' to the charged offense." *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) (internal quotation marks omitted).

[14] Pennsylvania has adopted a similar rule for disqualification. PA. CODE OF JUDICIAL CONDUCT Canon 3(C)(1)(c) ("Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where[] they know that they . . . have a substantial financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding . . . .").

before Ciavarella against Powell or companies owned by
Mericle testified about the judges' failure to disqualify
themselves or disclose their financial relationships. When the
relationships were specifically inquired about, Ciavarella
downplayed them or responded angrily. In each case, there
had been rulings squarely in favor of Mericle, Powell, and the
juvenile detention centers. Witnesses testified that had the
opposing counsels known about Ciavarella's and Conahan's
relationships, it would have affected the counsels' handling of
their cases.

As is relevant to Ciavarella's argument on appeal,
extrinsic evidence of other bad acts is admissible under
Federal Rule of Evidence 404(b) if three requirements are
met. First, the evidence must be offered for a proper purpose
under Rule 404(b); second, the evidence must be relevant
under Rule 402; and third, the probative value of the evidence
must outweigh its potential for unfair prejudice under Rule
403. *Huddleston v. United States*, 485 U.S. 681, 691 (1988).[15]
Proper purposes for the evidence include "motive,
opportunity, intent, preparation, plan, knowledge, identity,
absence of mistake, or lack of accident." Fed. R. Evid.
404(b). "Rule 404(b) is a rule of inclusion, not exclusion,
which emphasizes the admissibility of other crimes
evidence." *Gov't of V.I. v. Edwards*, 903 F.2d 267, 270 (3d
Cir. 1990).

---

[15] As a fourth requirement under Rule 404(b), evidence
must also "be accompanied by a limiting instruction (where
requested) about the purpose for which the jury may consider
it." *Cross*, 308 F.3d at 320-21.

To determine the relevance of the Rule 404(b) nondisclosure evidence, we must consider whether it would aid in the proof of a "fact . . . of consequence in determining the action." Fed. R. Evid. 401(b). For the Government to prove honest services mail fraud, it must demonstrate, among other things, that there was a scheme to defraud, which includes any course of action to deprive another of money, property, or the intangible right to honest services through fraudulent representations reasonably calculated to deceive a person of "ordinary prudence." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); 18 U.S.C. §§ 1341, 1346; *see also United States v. Riley*, 621 F.3d 312, 325 (3d. Cir. 2010) (setting forth the elements of honest services mail fraud). Fraudulent representations include the concealment of material facts and a failure to disclose information when the defendant is under a known legal duty to disclose. Third Circuit Model Jury Instructions 6.18.1341-1 (2012); *see also Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998). Here, the nondisclosure evidence serves a proper purpose under Rule 404(b) and is relevant to proving that the payments furthered the scheme to defraud through Ciavarella's failure to disclose his financial relationships in cases he presided over when there was an affirmative duty to do so and by assisting Mericle and Powell with favorable rulings during trial.

However, Ciavarella argues that the Rule 404(b) evidence could only be relevant to support a conflict-of-interest theory of honest services fraud, which is no longer viable after *Skilling v. United States*. In *Skilling*, the Supreme Court held that for the honest services fraud statute, 18 U.S.C. § 1346, to survive constitutional scrutiny, it may only be interpreted to criminalize fraud based on bribes and kickbacks

and not based on a failure to disclose a conflict of interest. 130 S. Ct. at 2931-33. The bribery-and-kickback theory of honest services fraud requires "a *quid pro quo*, that is, a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012) (internal quotation marks and citations omitted). Thus, while the evidence of nondisclosure by itself may not constitute honest services fraud based on a conflict-of-interest theory under *Skilling*, we believe that where there is also evidence of bribery or kickbacks, as there was before the District Court, then the evidence may be relevant to proof of a scheme to defraud under a bribery-and-kickback theory of honest services fraud. Furthermore, the District Court had instructed the jury that the Government was required to prove that the scheme to defraud must be conducted through the use of bribes and kickbacks and that a government official could breach his or her duty of honest services through the use of bribes and kickbacks.

Finally, Ciavarella maintains that even if the evidence is relevant, it still should have been excluded as unfairly prejudicial because it touched on the impermissible conflict-of-interest theory of honest services fraud. However, there is no indication that the Government used the Rule 404(b) evidence to demonstrate a conflict of interest, and the District Court clearly instructed the jury as to the limited purpose for which it could use the evidence and that the honest services charges required proof of a bribe or kickback. Thus, contrary to Ciavarella's contention otherwise, the District Court was within its "significant leeway," *Jemal*, 26 F.3d at 1272, in admitting the Rule 404(b) nondisclosure evidence, and there was no abuse of discretion.

### E.   False Financial Disclosures as Evidence of Honest Services Mail Fraud

Ciavarella contends that the evidence of false financial disclosure statements cannot sustain a conviction for honest services mail fraud based on a conflict-of-interest theory under *Skilling*, without evidence that Ciavarella accepted a bribe in exchange for filing the false disclosure statements.[16] Under Pennsylvania law, judges must file annual financial interest statements reporting on their outside financial interests, creditors, income, and gifts. 204 Pa. Code. § 29.52. For the years 2003 through 2007, Ciavarella and Conahan filed false financial interest statements in which they failed to disclose their receipt of payments from Mericle and Powell.

Ciavarella's argument is without merit. While the *Skilling* Court confined criminality under 18 U.S.C. § 1346 to schemes involving bribes or kickbacks, *Skilling*, 130 S. Ct. at 2931, "[t]he bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'" *Wright*, 665 F.3d at 568 (quoting *United States v. Bryant*, 655 F.3d 232, 240-41 (3d Cir. 2011)). As noted, concealment of material information through false disclosure statements, by itself, cannot serve as the basis for an honest

---

[16] We apply *de novo* review over questions of statutory interpretation. *United States v. Pavulak*, 700 F.3d 651, 671 (3d Cir. 2012). "We review the legal accuracy of a district court's jury instructions *de novo*." *United States v. Maury*, 695 F.3d 227, 261 (3d Cir. 2012).

services mail fraud conviction, but when there is evidence that the concealment by false disclosures furthers a scheme to defraud through bribes and kickbacks, then the false disclosure statements can support such a conviction. Here, the false financial disclosures that Ciavarella mailed are relevant to both the "use of the mails" and the "scheme to defraud" elements. The District Court properly instructed the jury that the Government was required to prove that the scheme to defraud was conducted through the use of bribes or kickbacks through the use of the mails. It also instructed that a government official may breach his or her duty of honest services through bribery or kickbacks and that the jury must find that the defendant engaged in undisclosed biased decision making through bribery or kickbacks.

Ciavarella also cites to *United States v. Genova*, 333 F.3d 750 (7th Cir. 2003), for the proposition that the "mere mailing" of false disclosure statements cannot constitute mail fraud because "the mailing of false statements does not read like the definition of bribery." Ciavarella's Br. at 46. *Genova* involved the city prosecutor's payment of kickbacks to the mayor in exchange for the city's legal business. *Genova*, 333 F.3d at 754. While the Court held that false financial disclosure statements were not predicate offenses under RICO because the state's disclosure requirement "does not read like a definition of bribery," it permitted the false disclosures to support the mail fraud convictions. *Id.* at 758. Thus, contrary to Ciavarella's position, *Genova* reaffirms our view that the false financial statements at issue in the instant action can support Ciavarella's honest mail fraud convictions. In *Genova*, the Court held that the false disclosures were part of a scheme to defraud because "[k]eeping a lid on the kickbacks was essential to permit their continuation" and "[a]

jury sensibly could conclude that the false mailings were integral to this scheme." *Id.* at 759. Here, too, a jury could conclude that Ciavarella's mailing of false financial disclosure statements was "integral" to his scheme to defraud through the use of bribes or kickbacks and that the false disclosures helped "keep a lid on the kickbacks" received by Ciavarella.

### F.    Sufficiency of the Evidence

Ciavarella next challenges the sufficiency of the evidence supporting his convictions for RICO, RICO conspiracy, honest services mail fraud, and money laundering conspiracy.[17]

#### 1.    RICO Conviction (Count 1)

Ciavarella was convicted of racketeering in violation of 18 U.S.C. § 1962(c) based on two predicate acts—honest services wire fraud based on three wire transfers on January 21, 24, and 28, 2003 (Racketeering Act One) and money laundering conspiracy (Racketeering Act Thirteen). The January 2003 wire transfers involved the $997,600 payment from Mericle to Ciavarella and Conahan. In essence, Ciavarella contends that the RICO conviction cannot be sustained because the 2003 payment from Mericle did not

---

[17]    We affirm the jury's verdict when there is substantial evidence that, viewed in the light most favorable to the government, would permit a reasonable finder of fact to convict. *Wright*, 665 F.3d at 567. A defendant raising a sufficiency of the evidence challenge has an exceedingly high burden. *Id.*

constitute a bribe given the jury acquitted him of the bribery counts related to Mericle's 2005 and 2006 payments and because Mericle testified that the 2003 payment was also a legitimate referral fee. Absent evidence that the January 2003 payment was a bribe, the racketeering predicate act of honest services wire fraud cannot be sustained.

A payment constitutes a bribe "as long as the essential intent—a specific intent to give or receive something of value *in exchange* for an official act—exists." *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007). The Government is not required to prove that the payments were intended "to prompt a specific official act. . . . [Rather,] payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." *Id.* (internal quotation marks and citations omitted).

Here, the Government presented the following evidence to support the jury's conclusion that the payment Ciavarella received from Mericle in 2003 constituted a bribe: the 2003 payments were transferred through multiple individuals to a company owned by Conahan, which ultimately transferred the funds to Ciavarella and Conahan; Ciavarella agreed to split the fee with Conahan because Conahan had done much of the work to confer the benefit on Mericle; Powell treated the payment as income for tax purposes; Conahan's company falsely reported the funds in the company books as a consultant's fee; Ciavarella worked to close down the existing county facility and move its best employees to PACC; Conahan, with Ciavarella's knowledge, signed a lease to assist Powell in securing financing; Ciavarella and Conahan failed to disclose the conflicts of

interest in civil cases before them; and Ciavarella and Conahan mailed false financial disclosure statements. While Ciavarella and Mericle testified that the payment was a referral fee and not a bribe, the jury was free to disbelieve them. Thus, there was sufficient evidence for a reasonable jury to conclude that the 2003 payment from Mericle constituted a bribe to support the predicate act for honest services wire fraud and to sustain the RICO conviction. Ciavarella fails to meet his high burden.

2.    Honest Services Mail Fraud Convictions (Counts 7, 8, 9, and 10)

There was also sufficient evidence to allow a reasonable jury to convict Ciavarella on each of the honest services mail fraud convictions based on the mailing of the Statement of Financial Interests in April 2004, March 2005, April 2006, and March 2007. For an honest services mail fraud conviction, in addition to the traditional mail fraud elements and that the scheme was conducted through the use of bribes or kickbacks, the Government must also prove: (1) "that the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take"; and (2) "that the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor." *Wright*, 665 F.3d at 568. Because the jury found that the 2003 payment constituted a bribe or kickback to support Racketeering Act One, there was sufficient evidence for a reasonable jury to conclude that Ciavarella's nondisclosure of that payment in his Statements of Financial Interests constituted honest services mail fraud.

3.    RICO Conspiracy and Money Laundering Conspiracy Convictions (Counts 2 and 21)

Ciavarella also contends that the conspiracy convictions cannot be sustained absent proof of a bribe or kickback. Because we hold that there was sufficient evidence for a rational jury to conclude that the 2003 payment from Mericle constituted a bribe to support the racketeering predicate act, Ciavarella's challenges to the RICO and money laundering conspiracy convictions also fail.

## G.    Statute of Limitations

Ciavarella argues that the RICO, honest services mail fraud, and conspiracy convictions are time-barred.[18]

---

[18] "We exercise plenary review over whether counts of an [I]ndictment should have been dismissed for violating the statute of limitations." *United States v. Bornman*, 559 F.3d 150, 152 (3d Cir. 2009). However, when a defendant waived a challenge to the statute of limitations, then we review for plain error. *United States v. Jake*, 281 F.3d 123, 132 (3d Cir. 2002). A five-year statute of limitations applies to all of the convictions. 18 U.S.C. § 3282(a). For a RICO charge, at least one of the predicate acts must have occurred within five years of the indictment. *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1168 n.1 (3d Cir. 1995) (Becker, J., concurring in part and dissenting in part) (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987)).

On January 23, 2009, after an Information was filed, Ciavarella signed a plea agreement, waiving any statute-of-limitations defense to charges under investigation in the event Ciavarella "vacates or sets aside any conviction or sentence of incarceration imposed pursuant to [the] plea agreement." Supp. App. 41. After the District Court rejected the plea agreement, on September 9, 2009, a grand jury returned an Indictment, charging Ciavarella with numerous offenses. A superseding Indictment was returned on September 29, 2010, containing the same charges but with revised language to conform with *Skilling*.

Following the return of the superseding Indictment, Ciavarella sought dismissal of certain charges as time-barred, including the honest services wire fraud counts (Counts 3, 4, and 5), honest services mail fraud counts (Counts 7, 8, and 9), bribery counts (Counts 11, 12, 13, and 14), money laundering counts (Counts 22, 23, 24, and 25), and extortion counts (Counts 27, 28, 29, and 30). The District Court denied the motion, holding that the charges were timely as of the filing of the original Indictment and that that the superseding Indictment did not expand on the charges. Post-trial, Ciavarella sought dismissal of the racketeering conviction and the conspiracy convictions (Counts 1, 2, and 21), arguing that the 2003 payment that served as a basis for the convictions was outside the statute of limitations. The District Court denied the motion as untimely. On appeal, Ciavarella challenges those convictions as time-barred, and reasserts his statute-of-limitations challenge to Count 7, the honest services mail fraud conviction, based on the April 2004 disclosure statement.

1.      RICO, RICO Conspiracy, and Money
        Laundering Conspiracy (Counts 1, 2, and
        21)

Ciavarella argues that the two predicate acts for his RICO conviction—honest services wire fraud based on three wire transfers, the last of which occurred on January 28, 2003, and money laundering conspiracy—occurred more than five years before the September 9, 2009 Indictment, and thus the RICO count is time barred. Additionally, the conspiracy convictions are time barred, according to Ciavarella, because the conspiracy was completed on the date of its final act— January 28, 2003. However, while Ciavarella objected prior to trial to other counts as time-barred, he did not include Counts 1, 2, or 21 in his objection.

"[I]n criminal cases[,] the statute of limitations does not go to the jurisdiction of the court but is an affirmative defense that will be considered waived if not raised in the district court before or at trial." *United States v. Karlin*, 785 F.2d 90, 92-93 (3d Cir. 1986). While Ciavarella would have been entitled to an instruction on the applicable statute of limitations to inform the jury of the need to prove that at least one predicate act occurred within five years of the date of the indictment, *Jake*, 281 F.3d at 129, he did not request it. Accordingly, under our current precedent, Ciavarella failed to preserve this objection, and we will not consider it on appeal.

Ciavarella looks to the Sixth Circuit, which has held that while the statute of limitations is not a jurisdictional bar, it is of such importance that it can be raised for the first time on appeal. *United States v. Titterington*, 374 F.3d 453, 458-60

(6th Cir. 2004). But this is not the law in our Circuit. Rather, we have held, consistent with nearly all of our sister Circuits, that the statute of limitations is an affirmative defense that will be waived if not properly preserved prior to or during trial. *See Karlin*, 785 F.2d at 92-93; *see also United States v. Arky*, 938 F.2d 579, 582 (5th Cir. 1991) ("[I]t is difficult to conceive why [the statute of limitations defense] alone, of all the defendant's affirmative defenses, should not be waived if not asserted at trial.").

2.    Honest Services Mail Fraud (Count 7)

(a)    **Application of Statute of Limitations**

Ciavarella adequately preserved his objection to Count 7's statute of limitations by raising it in his pre-trial motion to dismiss. Count 7 alleges a violation of honest services mail fraud based on the mailing of a Statement of Financial Interests in April 2004. The original Indictment was filed on September 9, 2009, over five years after the conduct alleged in Count 7. This count is clearly time-barred absent any waiver by Ciavarella.

The Government argues that Ciavarella expressly waived the statute-of-limitations defense through his January 2009 plea agreement. The plea agreement states:

> The defendant further agrees to waive any defenses to the prosecution of [any] charges [currently under investigation related to this matter] based upon laches, the assertion of speedy trial rights, any applicable statute of

limitations or any other grounds in the event that the defendant successfully vacates or sets aside any conviction or sentence of incarceration imposed pursuant to this plea agreement.

Supp. App. 41. As previously stated, Ciavarella signed the plea agreement, later withdrew his guilty plea, and proceeded to trial where he was found guilty of Count 7 on February 18, 2011. The Government contends, though, that Ciavarella's "conviction" was established by his guilty plea, and that "[b]y withdrawing his plea, Ciavarella 'vacated and set aside' his conviction." Gov't Br. at 60-61.

We see no basis for the Government's interpretation of the waiver provision in the plea agreement. The language— "vacates or sets any conviction . . . imposed *pursuant to this plea agreement*"—clearly contemplates a conviction that was achieved *due to* that plea agreement. Here, Ciavarella's conviction on Count 7 was achieved not as a result of the plea agreement, as Ciavarella withdrew his plea and proceeded to trial, but as a result of the jury's verdict. Moreover, the plea agreement also states that "either party has the right to withdraw from this agreement and withdraw any guilty plea entered" if the District Court fails to accept the stipulated sentence. Supp. App. 48. This is precisely what occurred here. Accordingly, even if we found the agreement regarding the statute-of-limitations waiver to include this type of situation, the waiver was nullified by the Court's rejection of, and the parties' withdrawal from, the agreement. For these reasons, we hold that Ciavarella did not waive his statute-of-limitations defense to the honest services mail fraud count

based on a mailing in April 2004, and we will vacate the conviction for Count 7.

### (b)    Effect of Vacatur

Having vacated Count 7, we address whether we must remand for resentencing *de novo*. Resentencing on all counts is warranted "when a multicount conviction produces an aggregate sentence or sentencing package." *United States v. Davis*, 112 F.3d 118, 122 (3d Cir. 1997) (internal quotation marks omitted). Resentencing *de novo* is necessary

> when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan. When a conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand . . . if that appears necessary in order to ensure that the punishment still fits both crime and criminal.

*Id.* (citing *United States v. Pimienta-Redondo*, 874 F.2d 9, 14 (1st Cir. 1989)).

District courts should resentence *de novo* when an interdependent count of an aggregate sentence is vacated. *Id.* at 123. In *United States v. Miller*, the defendant's two child pornography counts were grouped, but when one of the

counts was vacated on appeal, the remaining count had a lower total offense level, and thus we held that *de novo* resentencing was appropriate. 594 F.3d 172, 181 (3d Cir. 2010). Similarly, in *Davis*, the defendant's counts for drug offenses and for use of a firearm in connection with a drug trafficking offense were grouped. 112 F.3d at 119. After vacating the firearm offense, we recognized that those counts were interdependent because without the firearm offense, the total sentence would be calculated differently. *Id.* at 121.

Here, the District Court combined the offenses into multiple groups, each of which received its own sentence that ran consecutive to the other groups' sentence. In the group containing Count 7, Counts 1, 2, 8, 9, 10, and 21 were also included because the offense level for those counts is determined largely based on loss amount. *See* U.S.S.G. § 3D1.2(d). Under the Sentencing Guidelines, when multiple counts are grouped, the court applies the Guideline for the count with the highest offense level. *Id.* § 3D1.3(a). In the relevant group, the money laundering conspiracy, Count 21, led to the highest offense level, and resulted in an adjusted offense level of 44. *See id.* §§ 2B1.1(b)(1)(J), 2C1.1(a)(1), (b), 2S1.1(a)(1), 3A1.1(b), 3C1.1. Because the remaining groups' offense levels are far lower, they did not affect Ciavarella's total offense level. *Id.* § 3D1.4(c). With the maximum offense level of 43 and a criminal history category of I, his advisory Guideline range is life imprisonment. Absent Count 7, Ciavarella's total offense level and advisory Guideline range is identical. Ultimately, however, the District Court sentenced Ciavarella to a below-Guidelines sentence of 336 months' imprisonment, which included a 240-month sentence for the group of offenses containing Count 7. Thus, because the vacated count did not affect Ciavarella's total

offense level, Guideline range, or sentence, we hold that resentencing *de novo* is not required. *Davis*, 112 F.3d at 121-23. However, because Ciavarella was ordered to pay a special assessment of a hundred dollars for each count, including Count 7, totaling $1,200, we will vacate the imposition of the special assessment as to Count 7 and remand to the District Court to amend the judgment to reduce the special assessment consistent with this opinion.

### H.    The District Court's Consideration of Evidence During Sentencing

Finally, we consider Ciavarella's challenges to his sentence. He argues that the District Court relied on improper evidence and made findings of fact that were inconsistent with the jury verdict, in violation of his Sixth Amendment right to a jury trial, and imposed a substantively unreasonable sentence.[19]

Contrary to Ciavarella's contention, his Sixth Amendment right to a jury trial is not implicated by fact finding during a sentencing proceeding unless those facts increase the statutory maximum punishment. *Apprendi v. New*

---

[19] We review a district court's factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) (en banc). We "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). In evaluating the substantive reasonableness of a sentence, we consider "whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Grier*, 475 F.3d at 561.

*Jersey*, 530 U.S. 466, 490 (2000); *Grier*, 475 F.3d at 562 ("Once an individual has been convicted by a jury beyond a reasonable doubt of the predicate facts of illegal conduct, triggering a statutory maximum penalty, a court may impose any sentence on the individual up to that maximum."). Here, the total sentence imposed was 336 months' imprisonment, less than the maximum statutory penalties, which total 137 years' imprisonment, excluding Count 7. *See* 18 U.S.C. §§ 371, 1341, 1956(a), 1962(c),(d), 1963; 26 U.S.C. § 7206(1).

Ciavarella's argument that the District Court relied on improper evidence in sentencing him is also without merit. He asserts that the District Court should not have considered Powell's testimony, any payments by Powell, or the 2005 and 2006 payments by Mericle, which the jury had rejected. Additionally, because the jury rejected the bribery charges and the notion of a conflict of interest, according to Ciavarella, the District Court improperly increased his sentence based on his failure to disclose that conflict of interest to juvenile offenders. But "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). "[T]he jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty." *Id.* at 155 (internal quotation marks omitted). Here, the District Court considered Powell's testimony and evidence of additional payments from Powell and Mericle, and it found the relevant conduct was proved by a preponderance of the evidence. We find no clear error in the District Court's factual findings because there is sufficient evidence in the record to

support the finding of multiple payments and an ongoing conflict of interest.

Additionally, Ciavarella's challenge to the District Court's consideration of letters from the public also fails because a "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). While Ciavarella asserts that the letters lack reliability, he fails to provide any basis for this conclusion sufficient to establish a violation of his due process rights. *See United States v. Matthews*, 773 F.2d 48, 51 (3d Cir. 1985) (recognizing that a court determines whether a defendant's due process rights have been violated by the sentence court relying on "misinformation of a constitutional magnitude").

Finally, Ciavarella argues that his sentence was substantively unreasonable. Ciavarella's advisory Guideline range was life imprisonment. The District Court considered the arguments of both parties, including the defense's arguments for a sentence less than life imprisonment. It ultimately imposed a below-Guideline sentence of 336-months' imprisonment having "taken into account . . . the factors [it was] obliged to consider under Section 3553(a)." App. 1504. When a sentence is outside of the Guidelines range, we "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51. Here, the 336-month below-Guidelines sentence, while significant, is permissible. We are assured that the District Court properly evaluated the § 3553(a) factors. *United States v. Lychock*, 578 F.3d 214, 219

(3d Cir. 2009) ("A sentencing court need not discuss and make findings as to each of the § 3553(a) factors . . . ."). We hold that the sentence is substantively reasonable.

### III.   CONCLUSION

For the foregoing reasons, we will vacate Ciavarella's conviction on Count 7, vacate the special assessment as to Count 7, and affirm the District Court's judgments of conviction and sentence as to the remaining counts. We will remand to the District Court to modify the judgment with respect to the special assessment consistent with this opinion.